**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

_____
|                                              )
DAVID L. THORPE,                              )   Case No. 1:19-cv-2988
|                                              )
      Plaintiff,                           )
|                                              )
  vs.                                       )
|                                              )
INDIANA ELECTRICAL WORKERS                    )
PENSION TRUST FUND, I.B.E.W.,                 )
|                                              )
      Defendant.                           )
_____ )

### COMPLAINT PURSUANT TO 29 U.S.C. § 1132(a)

Now comes the Plaintiff, DAVID THORPE, by his attorneys MICHAEL BARTOLIC of THE LAW OFFICES OF MICHAEL BARTOLIC, LLC, and JOHN P. HIGGINS of KATZ KORIN CUNNINGHAM PC, complaining against the Defendant INDIANA ELECTRICAL WORKERS PENSION TRUST FUND, I.B.E.W., he states:

### INTRODUCTION

1.     This is an ERISA pension dispute where a pension fund administrator reasonably interpreted its own plan language with advice of counsel in 2008, and applied it in determining the pension amount due to Plaintiff.  Ten years later, in 2018, the pension fund demanded it recoup payments to Plaintiff simply because new lawyers advising the fund preferred, with the benefit of hindsight, a different interpretation of the same plan language.

2.     The facts demonstrate that Defendant's 2018 interpretation of the pension plan is unreasonable, contrary to the terms of the pension plan, and results in unjust enrichment to the pension plan.

3.      Defendant also failed to provide any explanation for how the administrator's decision 10 years ago was unreasonable.

4.      Even if Defendant could provide a reasonable basis for its revised interpretation of the pension plan, Defendant's actions are barred.  If Defendant prevails in this case, no pensioner will ever be able to rely on his or her pension income if pension administrators are permitted to simply change their minds about which interpretation of a plan they prefer years after making a decision and recoup benefits already paid, thus undermining a critical policy underlying the ERISA statute that pensioners must be able to rely on the promises of pension benefits made to them by those very administrators.

5.      Plaintiff brings this action pursuant to Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a), seeking LTD benefits due pursuant to the terms of an employee benefit plan, a declaration of his rights, estoppel, and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).

## THE PARTIES

6.      Plaintiff, David L. Thorpe, ("**David**" or "**Plaintiff**"), is a former employee of the Miller Eads Company that, pursuant to a collective bargaining agreement with the International Brotherhood of Electrical Workers Local No. 481, was a contributing employer to the Indiana Electrical Workers Pension Trust Fund, I.B.E.W.  Incident to his employment, David accrued pension benefit credit with the Indiana Electrical Workers Pension Trust Fund, I.B.E.W. as part of his Negotiated Wage Package. At all relevant times, David was and is a "participant" as defined by 29 U.S.C. § 1002(7).

7.      Defendant Indiana Electrical Workers Pension Trust Fund, I.B.E.W. (the "**Pension Fund**") is a "pension plan" as that term is defined by 29 U.S.C. § 1002(2).  The

Pension Fund provides pension benefits to participants.  A copy of the document that provides the terms of the Pension Fund is attached as Exhibit 1.  The summary plan descriptions of the Pension Fund, for the relevant time period, are attached as Exhibits 2 and 3.

## JURISDICTION AND VENUE

8.     The Court has general subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as it arises under ERISA—a law of the United States—and specifically pursuant to 29 U.S.C. §§ 1132(e)(1) and 1132(f), which specifically provides the District Court with jurisdiction to hear civil actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

9.     At all relevant times, Plaintiff lived in the Southern District of Indiana.  In addition, the plan at issue is administered in the Southern District of Indiana.  Venue is thus proper in the United States District Court for the Southern District of Indiana.  29 U.S.C. § 1132(e)(2).

10.    The ERISA statute provides a mechanism for administrative or internal appeals of benefit claim denials at 29 U.S.C. § 1133.  Those avenues of appeal have been exhausted at considerable expense to David.

## STATEMENT OF FACTS

11.    David is a participant in the Pension Fund.  As a participant, he was entitled to benefits set forth in the documents and instruments setting forth the terms of the Pension Fund.

12.    David began participating in the Pension Fund in 1978.

13.    David married Kathleen J. Thorpe ("**Kathleen**") on June 21, 1980, and the parties subsequently divorced on June 9, 2006, as set forth in a certain divorce decree which legally dissolved the marriage (the "**Divorce Decree**").

14.   Pursuant to the Divorce Decree, a Domestic Relations Order was entered on July 26, 2007 that set forth the terms by which accrued pension benefits during the marriage would be apportioned to Kathleen.

15.   The Pension Fund administrator accepted the Domestic Relations Order, representing that the manner in which it was drafted and the manner in which it assigns benefits to Kathleen, the alternate payee, complies with the Pension Fund terms and ERISA.

16.   Following acceptance by the Pension Fund and entry by the court, the Domestic Relations Order became a Qualified Domestic Relations Order ("**QDRO**") and became one of the documents and instruments governing the terms of the Pension Fund for David and Kathleen.

17.   The QDRO did not specify how the apportionment of pension benefits for the duration of the marriage had to be calculated, or when it had to be split in the event David and Kathleen did not elect to begin pension payments at the same time.

18.   The QDRO states "Alternate Payee shall have the right to elect any form of benefits permitted by the Plan as of the date Alternate Payee elects to begin receiving benefits as if such Alternate Payee were a participant in the Plan."

19.   The pension plan document states one cannot commence receiving benefits until the later of the first day of the calendar month coinciding with or following:

A.  The date on which the Participant attains Normal or Early Retirement Age;

B.  The date specified in the Participant's application to the Trustees for Deferred Vested Benefits; or

C.  The date the Trustees receive the Participant's application for Deferred Vested Benefits.

(Ex. 1 at 30)

20.   Following entry of the order by the Court, the QDRO was distributed to the Pension Fund's Administrator and Board of Trustees.

21.     On May 20, 2008 and with the QDRO in its possession, the Pension's Fund's administrator calculated the amount of David's pension.  The calculation communicated only the single life annuity amount and a 10-year certain option, revealing the Pension Fund took into account David was divorced and there was a QDRO in effect.

22.     On May 27, 2008, David applied for his pension.  Based on the calculations, David elected the 10-year certain pension option.

23.     On May 28, 2008, the Pension Fund Administrator confirmed the election in writing, and confirmed that David would receive $3,847 per month under the 10-year certain pension.

24.     On June 19, 2008, the Pension Fund Administrator signed a calculation report that calculated the total accrued benefit as $3,939.98 per month, reduced to $3,847.00 per month if taken as a 10-year certain lifetime annuity.  The report confirmed that it took into account the QDRO by listing the divorce decree in the list of documents considered.

25.     In reviewing the pension calculation, David called the Pension Fund office to confirm whether the calculations were correct in light of his QDRO.  Carolyn Lyons, on behalf of the Pension Fund, advised David the calculations were correct, and that until Kathleen elected to begin receiving her pension benefits, the calculations represented David's benefit amount. Ms. Lyons indicated that David's benefit amount would not be adjusted until Kathleen elected to begin receiving benefits as an alternate payee pursuant to the QDRO.

26.     David requested written confirmation that the Pension Fund considered the QDRO in making the calculation.

27.     Before sending the written confirmation, the Pension Fund asked United Actuarial Services, Inc. ("**UAS**") to review the QDRO and accrued benefits.  On July 16, 2008, UAS

provided a report to Carolyn Lyons at the Pension Fund calculating what the benefits would be to both David and Kathleen if both had elected to receive benefits effective May 1, 2008.  If they both elected benefits right away, David's benefit would be $1,872.23 per month as a 10-year certain annuity, and Kathleen's payment would be $1,941.86 as a 10-year certain annuity.  The total accrued benefit if both Kathleen and David took the pension at the same time as 10-year certain annuities would be $3,814.09 per month.

28.     UAS copied the Pension Fund's counsel, Frederick Dennerline III, on its report. Mr. Dennerline, in advising the Pension Fund, reviewed the documents and instruments governing the Pension Fund, including the QDRO, and considered the UAS report.  He advised the Pension Fund that the QDRO does not require splitting the accrued benefit immediately, and it could be split upon the alternate payee, Kathleen, also electing to receive the pension payment.

29.     On July 24, 2008, Carolyn Lyons provided written confirmation to David, as follows:

> Per Rick Dennerline: He read thru the QDRO and it does <u>NOT</u> say that we have to segregate the money for the QDRO payable to Kathleen.  Until she applies for the benefit, he gets 100% of his benefit.

(emphasis in original).

30.     The Pension Fund counsel's analysis and interpretation of the Plan and QDRO at the time was reasonable.  Had Kathleen immediately elected the pension, there would be no difference.  However, because the Pension Fund does not commence benefit payments until after the Participant or Alternate Payee applies for the pension, in the event Kathleen delayed electing her pension, the Pension Fund would still pay out 100% of the accrued benefits.  If it followed UAS's approach, and Kathleen delayed electing to receive her pension, the Pension Fund would simply receive a windfall.

31.     Mr. Dennerline's advice to the Pension Fund (which it followed) was reasonable, as the Pension Fund should not receive a windfall due to a divorce, as payments to Kathleen (and any corresponding adjustment to David's monthly pension amount) could not commence until Kathleen applied for benefits, as provided in the pension plan.

32.     As a result of this analysis, the Pension Fund's administrator made a decision in 2008, based on review of the QDRO and calculations, and consultation with counsel, that the interpretation of the QDRO and calculation of pension was reasonable.

33.     At no time between July 2008 and 2018 did the Pension Fund take a position that the 2008 decision on how to apply the QDRO to David's pension calculation before Kathleen elected to receive her pension was any sort of calculation, administrative, or ministerial error. For 10 years, the Pension Fund treated this as a reasonable interpretation of the documents, having full knowledge of the alternative ways to interpret the QDRO, and all the facts considered at the time of making the discretionary decision on how to interpret and apply the QDRO.

34.     Sometime between July 2008, and July 2017, a new law firm began to serve as counsel to the Pension Fund: Ledbetter Parisi LLC.

35.     Upon information and belief, between April 1, 2018 and April 4, 2018, Kathleen contacted the Pension Fund for the purpose of applying to receive a pension as alternate payee.

36.     On April 4, 2018, the Pension Fund's new counsel, Ledbetter Parisi LLC, emailed UAS regarding re-performing computations of David's pension benefit and Kathleen's pension benefit.  Upon information and belief, Ledbetter Parisi LLC asked UAS to re-iterate its position from ten years ago that David's pension benefit could have been reduced immediately in 2008, regardless of whether Kathleen elected her pension at that time—an interpretation deliberately

considered, with all relevant facts in mind, and rejected by the Pension Fund in 2008 upon advice of its former counsel, Frederick Dennerline.

37.     The Pension Fund or Ledbetter Parisi LLC also drafted a QDRO calculation request memo to UAS.

38.     On April 11, 2018, pursuant to Ledbetter Parisi LLC's request, UAS re-computed the calculation of Kathleen's pension benefits, and reiterated that David's pension could have been calculated at a lower amount to have been awarded ten years earlier—an interpretation deliberately considered, with all relevant facts in mind, and rejected by the Pension Fund in 2008 upon advice of its former counsel, Frederick Dennerline III.

39.     Based on information and belief, the Pension Fund's new outside counsel, Ledbetter Parisi LLC, advised the Pension Fund that because Kathleen waited so long to elect the pension, and the Pension Fund would have saved a lot of money by not paying out the entire accrued benefit had it split the benefit in May 2008, it should assert there was an "error" and substitute a different interpretation of the QDRO now for the reasonable interpretation applied ten years earlier, just so the Pension Fund could withhold David's pension.

40.     On April 17, 2018, on behalf of the Pension Fund, fund counsel Michael A. Ledbetter wrote David a letter asserting there was an "error" ten years ago in calculating David's pension, and it should have been reduced in May 2008.

41.     There was no "error" as asserted by Mr. Ledbetter.  There was simply a hindsight critique by one lawyer of a prior lawyer's reasonable advice to the same client ten years earlier. The April 17, 2018 letter failed to explain how the error occurred, what information was overlooked, what mathematical error occurred, or what ministerial error happened.  The letter wholly failed to mention that what occurred was a fund administrator weighed the various

interpretations of plan language, considered all relevant facts, and selected an interpretation with advice of counsel, and that a new lawyer, with ten years of hindsight, opined could have chosen a different alternative.

42.     Upon information and belief, the Pension Fund never asserted a breach of fiduciary duty by the administrative manager or the trustees for taking the interpretation they did in 2008.

43.     Upon information and belief, the Pension Fund never asserted any claim for legal malpractice by its former counsel, Mr. Frederick Dennerline.

44.     On June 25, 2018, Ledbetter Parisi LLC wrote David another letter stating there was an overpayment and David's pension would be reduced to recoup the overpayment. Specifically, the letter states, "Since discovery of the overpayment, your monthly benefit has been paid correctly, at $1872.23 per month."   However, the Pension Fund did not recently "discover" how the QDRO was being applied to David, as Ledbetter Parisi LLC's interpretation was considered, weighed, and rejected upon advice of counsel ten years earlier in setting David's pension amount.  The letter also asserted David's pension would be further reduced to recoup the alleged "overpayment", which was really just a different interpretation by a new lawyer ten years later with the benefit of hindsight.

45.     On October 8, 2018, with an agreed upon extension by the Pension Fund, David timely appealed the decision to withhold a portion of his pension payment and that there was not any overpayment.

46.     On February 25, 2019, the Pension Fund upheld its decision to withhold David's pension to recoup the alleged "overpayment" caused 100% by a new lawyer simply disagreeing

with the analysis of former counsel, which rejected the current approach after considering all relevant factors.

47.     David reasonably relied upon the written representation of how the Pension Fund would interpret and apply the QDRO in 2008 by proceeding to retire and collect his pension.

48.     Had the Pension Fund taken the position in 2008 that David's pension would immediately be reduced, he would have continued working to earn extra income while he was still in his working years.

49.     Now, David is past normal retirement age and continuing to work to pay a quarter million dollars is not feasible.

50.     Moreover, had the Pension Fund notified David promptly after awarding his pension in 2008 that it would change its interpretation (without conceding it would have the authority to change the interpretation), David could have proceeded with a breach of fiduciary duty claim against the pension administrator.

51.     The Pension Fund's over 10-year delay in changing its interpretation has caused severe prejudice to David.

52.     Had the Pension Fund initiated legal action to correct the May 2008 decision, it would be barred under Indiana's statute of limitations applicable to breach of written contract.

53.     The Pension Fund should not be permitted to do via self-help what it would be barred from obtaining through proper legal action.

54.     David exhausted his required pre-litigation remedies under the plan and all conditions precedent to the filing of this action have been performed or have occurred at considerable expense  to David.

**Count I—Benefits Due/Declaration of Rights under the Plan**

55. David realleges and incorporates by reference herein paragraphs 1–54 of the preceding allegations.

56. The Pension Fund's 2018 decision to withhold David's pension to recoup ten years of payments to him improperly attempts to disturb the discretionary decision made by the administrator, with advice of counsel, over ten years earlier. Such action is contrary to the terms of the plan and ERISA.

57. The Pension Fund failed to provide David with a full and fair review of his claim in violation of 29 U.S.C. § 1133, as well as 29 C.F.R. § 2560.503-1. Under 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights under the terms of the plan.

58. As a result of the Pension Fund's withholding of David's pension benefits, subsequently upholding that decision, and the refusal to overturn it, there exists an actual case and controversy by and between the parties hereto entitling David to a declaration of rights clarifying the benefits to which he is entitled under the Plan.

WHEREFORE, Plaintiff prays for the following relief:

A.  That the Court enter judgment in favor of the Plaintiff and against the Pension Fund, and award Plaintiff all past due pension benefits;

B.  That the Court order Plaintiff's benefits reinstated in the amount equal to what the Pension Fund decided it would be recalculated to upon Kathleen electing her pension;

C.      That the Court order the Pension Fund to return to David all pension benefits withheld by the Pension Fund via self-help plus prejudgment interest on all benefits that have accrued prior to the date of judgment;

D.      That the Court order the Pension Fund pay Plaintiff any post-judgment interest accruing after the date of judgment and prior to the Pension Fund making the required payment to Plaintiff;

E.      That the Court award Plaintiff his reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g) and the costs of suit; and

F.      That the Plaintiff recovers any and all other relief to which he may be entitled.

## Count II—Estoppel

59.      David realleges and incorporates by reference herein paragraphs 1–58 of the preceding allegations.

60.      David pleads this Count in the alternative to, and not in addition to, Count I.

61.      The Pension Fund made a knowing representation to David in writing about how the Pension Fund interpreted and applied the QDRO in 2008, following a full evaluation of all the relevant facts, and weighing the alternative interpretation.

62.      The Pension Fund made that representation in writing.

63.      The Pension Fund chose a reasonable interpretation of the QDRO in 2008, and communicated that interpretation in writing.

64.      David reasonably relied on that interpretation to his detriment.

65.      David would be unduly prejudiced by allowing the Pension Fund to renege on that knowing, written representation now.

66.     The Pension Fund should be estopped from reneging on its knowing, written representation of how it interprets and applies the QDRO.

WHEREFORE, Plaintiff prays for the following relief:

A.      That the Court enter judgment in favor of the Plaintiff and against the Pension Fund, and order the Pension Fund is estopped from altering its interpretation of the QDRO that it communicated in writing in 2008;

B.      That the Court order the Pension Fund return to Plaintiff all pension benefits withheld from Plaintiff since Kathleen applied for a pension, with prejudgment interest accruing until the date of payment by the Pension Fund;

C.      That the Court order the Pension Fund to return to David all pension benefits withheld by the Pension Fund via self-help plus prejudgment interest on all benefits that have accrued prior to the date of judgment;

D.      That the Court order the Pension Fund pay Plaintiff any post-judgment interest accruing after the date of judgment and prior to the Pension Fund making the required payment to Plaintiff;

E.      That the Court award Plaintiff his reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g) and the costs of suit; and

F.      That the Plaintiff recovers any and all other relief to which he may be entitled.


Respectfully Submitted,

/s/ *Michael Bartolic*
One of the attorneys for the Plaintiff

Michael Bartolic
The Law Offices of Michael
Bartolic, LLC
208 S. LaSalle Street, Suite 1420

Chicago, Illinois 60604
Tel: 312-635-1600
Fax: 312-635-1601


/s/ *John P. Higgins*
One of the attorneys for the Plaintiff

John P. Higgins, Atty. No. 30673-49
Katz Korin Cunningham PC
The Emelie Building
334 North Senate Avenue
Indianapolis, IN  46204-1708
Tel: 317-464-1100
Fax: 317-464-1111

4835-0304-4762, v. 3